UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

GAYNETT POWELL,

         Plaintiff,

v.                                    Case No. 5:16-cv-303-Oc-34PRL

JEREMY A. HARRIS, et al.,

         Defendants.

_____

**ORDER**

**I. Status**

Plaintiff Gaynett Powell, an inmate of the Florida penal
system, initiated this action on March 18, 2016, pursuant to the
mailbox rule, by filing a pro se Civil Rights Complaint Form
(Complaint; Doc. 1). In the Complaint, Powell asserts claims
pursuant to 42 U.S.C. § 1983 against the following remaining
Defendants: (1) Jeremy A. Harris; (2) Ernest L. Reed; (3) Carol
Casimir; (4) Gail Anderson; (5) Warden Jennifer Folsom; (6) Tommie
Young; (7) Faleshia A. Williams; (8) Jhon Deo (John Doe); (9) L.
Braggs; and (10) Dr. Virginia Mesa, M.D., Chief Health Officer
(CHO).[1] Powell asserts that the Defendants retaliated against him
in 2012 and 2013 when they placed him in administrative confinement
(AC), filed a disciplinary report (DR), used an invalid DR as a
basis to place him in disciplinary confinement (DC) and close

_____

[1] The Court dismissed Powell's claims against Defendants
Maldano, Furto, Campbell, Robert, Torso, and Walker. See Orders
(Docs. 153, 179).

management (CM), transferred him to other facilities, confiscated his property, and denied him adequate medical treatment. See Complaint at 14-15. As relief, he seeks compensatory and punitive damages as well as declaratory and injunctive relief.

This matter is before the Court on Defendants Harris, Braggs, Casimir, Reed, Folsom, Williams, Young, and Anderson's Motion for Summary Judgment (Motion; Doc. 171) and Defendant Mesa's Motion for Summary Judgment (Mesa Motion; Doc. 196). They submitted exhibits in support of their summary judgment requests. See Def. Exs. (Docs. 171-1 through 171-2; 196-1 through 196-2).[2] The Court advised Powell of the provisions of Federal Rule of Civil Procedure 56, notified him that the granting of a motion to dismiss or a motion for summary judgment would represent a final adjudication of this case which may foreclose subsequent litigation on the matter, and gave him an opportunity to respond to the Motions. See Order (Doc. 17); Summary Judgment Notices (Docs. 172, 197). Powell responded. See Responses (Docs. 190, 209); Affidavits (P. Aff.; Docs. 191, 207). Defendants' Motions are ripe for review.

## II. Plaintiff's Allegations

In his Complaint, Powell asserts that the events leading up to Defendants' retaliatory conduct began in March 2012 at Lake Correctional Institution (LCI). See Complaint at 8. He states that

---

[2] The Court cites to the document and page numbers as assigned by the Court's Electronic Case Filing System.

there was an anonymous tip that inmates were planning an escape. See id. According to Powell, Defendant Reed placed several inmates in AC pending an investigation, and wrote a DR against one of the inmates for possession of escape paraphernalia that included a lock belonging to Powell. See id. Powell avers that the accused inmate listed Powell as a witness. See id. He states that he "executed" a statement on March 21, 2012, and admitted that he owned the lock. Id. at 8-9. He asserts that Defendant Reed directed corrections officers to place Powell in AC. See id. at 9.

Next, Powell states that an inmate was stabbed in the recreation yard. See id. According to Powell, Defendant Reed obtained the inmate victim's statement, accusing Powell and two other inmates of the assault. See id. He avers that the inmate victim "declared" that Reed and other officers "coerced" him to identify Powell as one of the attackers. See id. He asserts that the inmate victim later recanted his accusations against Powell and another accused inmate. See id. According to Powell, Reed nevertheless relied on the inmate victim's "initial statement," and issued DRs for battery against Powell and the other accused inmates. See id. He states that Officer Campbell delivered the DR to him on March 23rd,[3] see id. at 9, and made comments, such as "we got the other inmates' statements and the accuser's two statements,

---

[3] Powell states that the event occurred on March 23, 2016. See Complaint at 9. However, given Powell's other assertions, it is apparent that he intended to identify 2012 as the correct year.

[and] we already decided what we are going to do with you good buy [sic][,]" and "yes, for that statement you did." Id. at 10.

Powell maintains that Defendants Williams and Braggs "acquitted" the other accused inmate on March 27, 2012, based on their findings that the accuser had recanted his statement and that no officer had witnessed the stabbing. See id. He complains that Williams and Braggs "exclusively relied" on the accuser's initial statement, instead of his recantation, and found Powell guilty of the DR on March 29, 2012. Id. According to Powell, when he objected to the guilty finding, Williams stated that "the people uptop want us to find you guilty[;] you w[ere] advised against making that statement for your friend." Id. He avers that he complained about Defendants' conduct to the Regional Director and Governor in April 2012. See id.

Additionally, Powell asserts that Defendant Anderson knew about the inmate accuser's recantation, but still used Powell's DR as the basis for referring Powell to CM confinement on April 4, 2012. See id. at 10-11. He states that Defendants Harris and Young (members of the Institutional Classification Team (ICT)) knew about the accuser's recantation, the acquittal of the other accused inmate, and the ongoing retaliatory acts, but nevertheless recommended that Powell be placed on CM on April 12th. See id. at 11. He avers that Defendant Casimir, a state classification officer, returned without action the complaint Powell had submitted

to the Regional Director on April 13th, finding that the institution should address the issue. See id. According to Powell, Casimir approved both the referral and recommendation for Powell's CM confinement on April 18th. See id. He maintains that Defendant Young denied Powell's grievances relating the DR and CM issues on April 26th. See id. Notably, Powell contends that Secretary Representative Solano approved Powell's appeal and overturned the DR on June 7th. See id. Powell avers that Dr. Walker discontinued his antidepressant medication when his DR was overturned, stating Powell no longer needed the medication. See id.

According to Powell, the Governor's Office and the Office of the Florida Department of Corrections (FDOC) Secretary directed the FDOC to release Powell to open population and remove his DR and CM designation from its records. See id. at 11-12. He states that the Defendants however "used the void DR" as the basis to transfer him to an institution where their former colonel is the Warden. Id. at 12. He avers that the Warden directed his subordinates to file similar reports and transferred him back to LCI. See id. Powell maintains that Lieutenant Martinez placed him in AC at the Reception Center and permitted inmates to steal his property. See id. He declares that he was "reclassified" and transferred to another institution that filed "similar reports" and used those reports to involuntarily commit him to mental health hospitals when he refused to stop submitting complaints and grievances. Id.

Powell states that he "declared" a hunger strike, lost consciousness, and was transferred to LCI's mental health hospital in 2013. Id. He alleges that Defendant Folsom seized his property when he exited the transportation van, and never returned it. See id. According to Powell, Folsom advised him that they would "secure and return" the grievances and complaints Powell had filed against them. Id. He also avers that Folsom told Defendant Mesa that Powell "is back." Id. Powell maintains that he told Mesa about his hunger-strike symptoms (thirty-five-pound weight loss, exhaustion, high blood pressure, and bloody urine). See id. at 13. He asserts that Mesa denied him medical treatment, stating "if you stop writing grievances and complaints things will get better for you." Id. He states that Officer Maldano approached his cell, stating:

> So you are back? They said you lost a lot of weight[] but do not change, still complaining, doing statements and writing grievances. Colonel said you are still on the sh[-]t list. You got away easy the last time. This time I'm gong to whip you're [sic] a[--].

Id. Powell avers that he moved to another unit and filed a grievance against Mesa for the denial of medical treatment. See id. He maintains that Officer Maldano, who was reassigned to Powell's unit, advised Powell as follows:

> Hey a[--]hole[,] you thought you escaped again? But we always fix it so we could catch up with you. Dr. Mesa is one of us. I'm going to f[--]k you're [sic] a[--] up.

Id.

According to Powell, Sergeant Furto, Officer Maldano, and John Doe gave Powell a breakfast tray with missing food portions on February 9, 2013. See id. He states that when he showed them the tray and asked for more food, Maldano grabbed the tray, stating "you don't eat." Id. He avers that he and Maldano "grappled" for the tray, and as a result, Maldano "flipped and released the tray inside the cell" which spilled the food on the walls, door, and floor. Id. Powell maintains that when he put his palm on top of the food flap and asked to speak with the lieutenant, Maldano "punched" Powell's right palm numerous times. Id. at 14. He asserts that Defendant Mesa failed to provide "meaningful treatment" for his injuries. See id. Powell declares that he reported the mistreatment to Lieutenant Robert who placed him on property restriction and special management meals and denied him access to the day room, canteen, and recreational activities. See id. Powell also asserts that when he grieved the restrictions, he was transferred to a non-medical institution, and later to a medical facility. See id. He states that the FDOC promoted Defendant Harris to an Assistant Warden position, and transferred him to the medical institution where Harris encouraged the medical staff not to treat Powell. See id.

### III. Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure (Rules(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).[4] An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'q Co., 9 F.3d

---

[4] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 advisory committee's note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id. "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive." Campbell v. Shinseki, 546 F. App'x 874, 879 n.3 (11th Cir. 2013). Thus, case law construing the former Rule 56 standard of review remains viable.

913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." <u>Kesinger ex rel. Estate of Kesinger v. Herrington</u>, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. <u>See</u> <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." <u>Jeffery v. Sarasota White Sox, Inc.</u>, 64 F.3d 590, 593–94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson</u>, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." <u>Haves v. City of Miami</u>, 52 F.3d 918, 921 (11th Cir. 1995) (citing <u>Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro</u>, 38 F.3d 1571, 1578 (11th Cir. 1994)).

## IV. Rulings on Defendants' Motions to Dismiss

The Court previously partially granted Defendants Braggs, Harris, and Casimir's motions to dismiss (Docs. 65, 66) and Defendants Folsom, Reed, Williams, Anderson, and Young's motion to dismiss (Doc. 94) as to Powell's (1) claims for monetary damages from them in their official capacities, see Orders (Docs. 111, 125) at 7-8; (2) Eighth Amendment claims, see Doc. 111 at 8; Doc. 125 at 9-11; and (3) Fifth and Fourteenth Amendment claims, see Doc. 111 at 8-10; Doc. 125 at 11-12. Additionally, the Court sua sponte dismissed Powell's requests for compensatory and punitive damages, see Doc. 111 at 5-6; Doc. 125 at 6-7, and his equal protection claims, see Doc. 111 at 6-7; Doc. 125 at 7. However, the Court denied the motions to dismiss as to Powell's First Amendment retaliation claims against the Defendants. See Doc. 111 at 10-14; Doc. 125 at 12-14.

## V. Summary of the Arguments

In the Motion, Defendants Harris, Braggs, Casimir, Reed, Folsom, Williams, Young, and Anderson assert that there are no genuine issues of material fact, and therefore, the Court should grant summary judgment in their favor. They assert that some of Powell's First Amendment retaliation claims are barred by the four-year statute of limitations. See Motion at 13-14. Additionally, they maintain that they are entitled to qualified immunity. See id. at 20. In his Response, Powell relies on his affidavit (Doc. 191)

and deposition (P. Depo.; Docs. 171-2, 196-2) and asserts that there are genuine issues of material fact that preclude summary judgment in Defendants' favor. See Response (Doc. 190).

Defendant Mesa asserts that the Court should grant summary judgment in her favor as to Powell's Eighth Amendment claim, see Mesa Motion at 6-9, First Amendment retaliation claim, see id. at 9-11, and Fourteenth Amendment claim, see id. at 11-13. She also maintains that she is entitled to qualified immunity. See id. at 13-14. Additionally, she asserts that Powell's request for injunctive relief is moot, and he is not entitled to compensatory and punitive damages under 42 U.S.C. § 1997e(e) because he has not alleged any physical injuries resulting from Defendants' acts and/or omissions. See id. at 14-15. Relying on his affidavit (Doc. 207) and deposition, Powell asserts that there are genuine issues of material fact that preclude summary judgment in Defendant Mesa's favor. See Response (Doc. 209).

## VI. Analysis[5]

### A. Defendants' Motion for Summary Judgment (Doc. 171)

#### 1. Four-Year Statute of Limitations

Defendants assert that some of Powell's claims are barred by the four-year statute of limitations. See Motion at 13-14. In his

---

[5] For purposes of summary judgment, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to Plaintiff. Thus, the facts described in the Court's analysis may differ from those that ultimately can be proved.

Response, Powell states that the Defendants "are absolutely right" about the applicability of the four-year statute of limitations. Response (Doc. 190) at 19. Nevertheless, he maintains that the Defendants "misapplied" it. Id. He asserts, and this Court agrees, that he filed the Complaint on March 18, 2016, pursuant to the mailbox rule,[6] not April 25, 2016, as Defendants assert. See id. In the Complaint, Powell alleges that Defendants' retaliatory acts began on March 21, 2012. See Complaint at 8. A 42 U.S.C. § 1983 action brought in Florida is governed by Florida's four-year personal injury statute of limitations. Henyard v. Sec'y, Dep't of Corr., 543 F.3d 644, 647 (11th Cir. 2008). Therefore, Powell had until March 21, 2016, to file his claims against the Defendants. As such, his claims are timely filed.

## 2. First Amendment Retaliation[7]

Defendants Harris, Braggs, Casimir, Reed, Folsom, Williams, Young, and Anderson assert that they are entitled to summary judgment as to Powell's First Amendment retaliation claims against them. See Motion at 14-20. They maintain that, as to the third element, Powell "cannot show a causal connection between Defendants['] conduct and his protected speech." See id. at 15 (citations omitted). In his Response, Powell argues that there are

---

[6] See Complaint at 1 (showing Suwannee Correctional Institution's March 18, 2016 date stamp).

[7] The Court will address Powell's claims against Defendant Mesa in a separate section of this Order.

genuine issues of material fact that preclude summary judgment in Defendants' favor. <u>See</u> Response (Doc. 190).

The chronology of events on which Powell bases his retaliation claims is as follows. On March 5, 2012, there was an anonymous tip that inmates were planning an escape. <u>See</u> Complaint at 8; Def. Ex., Doc. 171-1 at 15, MINS[8] Incident Report. Defendant Reed placed three inmates (whom Powell describes as his cell mate, countryman, and friend) in AC pending an investigation. <u>See</u> Complaint at 8; Powell Aff. (Doc. 191) at 1. Deeann Hensley described what transpired that day.

> On 3/5/12, at approximately 300 PM., Captain Faleshia Williams received an anonymous note alleging that inmates in E dorm were planning an escape with the assistance of a security staff member. Inmates named were strip searched and their property [was] searched. During the search of inmate property, Officer Ryan Reedyk located 3 sheets, 2 pieces of sheet, 2 pillow cases and 2 locks tied together in a bundle under the heater vent in cell E4104L. Inmate Graham received a DR for escape paraph[erna]lia. Inmates Pack, Gray, and Dudley were placed in AC pending investigation. All inmates denied the allegation and provided written statements.

Def. Ex., Doc. 171-1 at 15. Powell states that his friend Graham "listed" him as a witness because one of the locks belonged to Powell. Complaint at 8; Powell Aff. at 1.

---

[8] MINS is an acronym for Management Information System Network.

On March 21, 2012, Defendant Reed summoned Powell to the dormitory, <u>see</u> Complaint at 8, "warned" Powell about executing a statement for his friend, <u>id.</u> at 9, and commented "we don't play that sh-t[.]" Powell Aff. at 1. Powell completed the statement (admitting that he owned one of the locks), and gave it to Sergeant Broadway. <u>See</u> Complaint at 9; Powell Aff. at 2. That same day, there was an inmate stabbing on the recreation yard, <u>see</u> Complaint at 9, and Officer McCrary advised Defendant Reed about the incident, <u>see</u> Def. Ex., Doc. 171-1 at 19.

> On 3/21/12 at approximately 130 pm[,] I ofc McCrary received a transmission from of. Duncan.... At approx. 138 pm I/M Dieudonne, Timmis # A-W11268 and Johnson, Justin # A-R21488 arrived. I/M Johnson stated, "This I/M just walked in medical, stating he just got into a fight." I just escorted him here. Later, I talked with I/M Dieudonne and he stated to me, "When the yard opened, 3 guys had jumped me, all 3 had knives, and no officer was present on the compound.["]

Def. Ex., Doc. 171-1 at 19. Defendant Reed prepared an Incident Report, stating in pertinent part:

> On March 21, 2012, at approximately 2:00 pm[,] I was advised by Medical Officer CO Larhonda McCrary that inmate Dieudonne, Timmis DC #W11268, had been assaulted with a weapon on the recreation field. The Institution was immediately placed on Level B Status. All additional staff from outside grounds and in service training were utilized to provide security and assist with searches. All inmates on the recreational field (400) were staged, searched, and escorted to their housing units along with all inmates in the program areas. Assistant Warden, A. Price and Major V. Barber were immediately notified of the incident and

actions taken. The Emergency Management site
was initiated by Sgt. S. Jackson in the main
control room summarizing the course of events.
I conducted an initial interview of Inmate
Dieudonne who stated that inmates McKinney,
Desmond, DC #L40919, assaulted him. Inmate
McKinney was apprehended and restrained
without incident. Inmates Powell, Gaynett, DC
#L07899, and Head, Jamal, DC #M45505, were
also placed in Administrative Confinement
pending Investigation for being involved in
the assault. Inmate Johnson, Justin, DC
#R21488 was also placed in Administrative
Confinement pending Investigation after he
walked inmate Dieudonne to Medical, as a
potential participant/witness. Inmate
Dieudonne was placed in Administrative
Confinement pending Protective Management
review. Two (2) homemade weapons were
discovered on the Recreation field, although
neither appear to be the weapon used in the
assault. The weapons were photographed and
placed in the evidence locker.

Def. Ex., Doc. 171-1 at 17-18. Defendants Harris and Folsom

reviewed the report, and Defendant Folsom stated that "[a]ll

inmates involved were placed in confinement pending charges and

transfer." Id. at 17. Defendant Reed directed officers to place

Powell in AC "[s]hortly" after Powell had executed his statement

for inmate Graham. See Powell Aff. at 2; Def. Ex., Doc. 171-1 at 7

(showing that Powell was assigned to AC on March 21, 2012).

Defendant Reed obtained Dieudonne's statement that accused Powell

and inmates McKinney and Head in the stabbing incident. See Def.

Ex., Doc. 171-1 at 22-23. Dieudonne stated that Powell stabbed him

in his "left top shoulder." Id. at 23.

As a result of Dieudonne's accusation, Defendant Reed issued a DR against Powell for aggravated battery or attempted aggravated battery on an inmate. See Complaint at 9; Def. Ex., Doc. 171-1 at 27. The facts supporting the DR are as follows:

> Inmate Powell, Gaynett DC #L07899 is being charged with 1-10 aggravated battery or attempted aggravated battery on an inmate. On March 21, 2012 at approximately 2:00 PM while assigned as third shift supervisor, I was notified of an aggravated battery which ha[d] occurred on the recreation yard. Inmate Dieudonne, Timmis DC #W11268, had been cut several times in his upper torso, facial, and arms area. Upon interviewing inmate Dieudonne, he advised me that inmate McKinney, Desmond DC #L40919, Inmate Head, Jamal DC #M54505, and Inmate Powell, Gaynett DC #L07899 were his attackers. Inmate Dieudonne also states "all three of them were stabbing me from different angles."[9] A subsequent search of the recreation field was conducted and inmate Powell was located in E-dormitory. Inmate Powell was interviewed and stated that he was not on the recreation field. He was in E-dormitory when the incident occurred. This is untrue. I had the control room page inmate Powell numerous times to report to E-dormitory to submit a witness statement on an unrelated incident. I was in E-dormitory when the pages were made and inmate Powell was not in the dormitory. As I departed E-dormitory to deal with this incident, inmate Powell walked by me and entered E-dormitory. At the time that we passed each other, I was unaware that he was possibly involved in this attack. **Inmate Powell is being housed in administrative confinement pen[d]ing the disposition of this report.**

___

[9] See Def. Ex., Doc. 171-1 at 22, Dieudonne's Statement, dated March 21, 2012.

Def. Ex., Doc. 171-1 at 27 (emphasis added). An investigation was conducted from March 21st until March 25th. See id. at 28. During the investigation, Dieudonne made a second statement, dated March 25, 2012, asserting that Powell had "nothing to do" with the stabbing incident. Id. at 30.

> I'm not writ[]ing this witness statement out of any kind of fear nor was I force[d] [in] any kind of way. On March 21[][,] 2012 We[d]n[e]sday I got stab[b]ed on the rec yard by only one inmate[.] But being that I was very mad at the time I wrote a witness statement saying three people w[ere] invol[v]ed with the stab[b]ing. Cause I was just going with wh[at]ever question I was being ask[ed] at the time being that I was mad. But at the time of the stab[b]ing Inmate Gaynett Powell DC #L07899 was not on the rec yard nor was he invol[v]ed in it. The only reason I wrote his name in the first statement was because I thought he sent the person at me who stab[bed] me being that I owed him money an[d] we w[ere] mad at each other. So when the police ask[ed] me was he invol[v]ed I said yes but he really wasn't. I was just mad at all the people I done had problems with in the past. **But no[,] inmate Powell DC #L07899 did not have nothing to do with [the] stab[b]ing on [the] rec yard nor was he [sic] present at the time** cause he was in [the] dorm when I got stab[b]ed. I know who stab[b]ed me an[d] it was not Powell who did it. The person who did it they found his shirt on the rec yard with my blood on it an[d] his name [was] rip[ped] off of his shirt. But I'm writ[]ing this statement cause I have to free the innocent. This is the truth. **I swear inmate Gaynett Powell DC #L07899 had nothing to do with me getting stab[bed].**

Id. (emphasis added). Officer Campbell notified Powell of the DR charge on March 25th. See id.

On March 29, 2012, Defendant Braggs (the DR team chairman) and Williams (a DR team member) found Powell guilty of the aggravated battery infraction based on Defendant Reed's written statement of the facts. <u>See</u> <u>id.</u> at 28-29. Defendant Braggs submitted an Affidavit, describing her involvement in the disciplinary process. <u>Id.</u> at 57-58, Affidavit of Lourdes Braggs (Braggs Aff.). She stated, in pertinent part:

> I was involved with inmate Powell's disciplinary hearing where he was found guilty of aggravated assault. The disciplinary hearing process allows the inmate to present evidence and witness statements. We review the documentation, statements and determine the involvement or guilt of the inmate. I understand that the victim inmate recanted his testimony about inmate Powell's involvement. This is not unusual and we see this happen frequently in areas of inmate assault. It is a consideration in the process but just because the victim inmate recants, this does not mean the case is automatically dismissed. Often, the victim inmate recants later on because he fears retaliation. We would look at inmate Powell's history of violence and disciplinary history to assist in determining credibility. It is important to consider the safety and security of everyone and also the nature and severity of the charge. If inmate Powell was violent and caught lying at the hearing, it could affect his credibility and the outcome of the hearing.

<u>Id.</u> at 58. Defendant Williams submitted a similar account. <u>See</u> <u>id.</u> at 59-60, Declaration of Feleshia Williams (Williams Decl.). She explained her role, stating in pertinent part:

> I was the Captain at Lake Correctional Institution in March 2012. I was one of the Disciplinary Hearing members for the stabbing

incident involving inmate Gaynett Powell, L07899. Inmate Powell was found [g]uilty by the disciplinary team for the aggravated assault of another inmate. The victim inmate did recant his testimony that inmate Powell was involved. We see this often. It is almost always true the initial statement made in such a case is the true one. Once the victim inmate gets away from the incident, they often are threatened or have second thoughts about naming another inmate for fear of retaliation or just being labeled a snitch. The disciplinary hearing team would also look at inmate Powell's record and history.

As to his claim I said anything about what "people up top" want, this is untrue. The decision to find inmate Powell guilty is a decision of the disciplinary review team after hearing and receiving testimony and evidence. Inmate Powell was present at the hearing. No one person makes the decision and the decision has to be approved by the warden.

Id. at 60. Defendant Young, as Assistant Warden of Programs, responded to Powell's grievance on April 28, 2012, stating in pertinent part:

It is the responsibility of the disciplinary team to weigh the facts, review all the statements and determine the credibility of any witness. In this case, the team accepted the reported officer's statement as credible and a decision was rendered to uphold the requirements set forth in Chapter 33-601-602.

Id. at 40. Young reviewed and approved the disciplinary team's decision on May 2, 2012. See id. at 29.

On April 4, 2012, Defendant Anderson "referred" Powell for CM assignment. See Complaint at 10; Def. Ex., Doc. 171-1 at 35, CM

Report; 61-62, Declaration of Gail Anderson (Anderson Decl.).

Anderson explained the basis for the CMI referral.

> Inmate being recommended for CM1 based on the events in his DR for 1-10 aggravated battery or attempted aggravated battery on an inmate. On March 21, 2012 shift supervisor was notified of an aggravated battery which occurred on the recreation yard. An inmate had been cut several times in upper torso, facial and arm area. Inmate Powell was identified as one of the attackers. During last six months, inmate had one other DR for 2-4 fighting.[10] He has no BLEO [(battery on a law enforcement officer)] convictions on staff at this time.

Def. Ex., Doc. 171-1 at 35. In her declaration, Anderson states, in

pertinent part:

> I was a Corrections Probation Officer at Lake Correctional Institution in 2012. I was involved with inmate case management and disciplinary hearings. I would make recommendations for close management designations for inmates who qualify for such classification. As [I] recall, Ms. Braggs was involved with inmate Powell's disciplinary hearing, so I was the one who recommended him for close management. As with inmate Powell, he was involved in an assault of another inmate, which qualifies him for close management. I only made the recommendation for close management and have nothing to do with the actual determination. This is done by the institution classification team.

Anderson Decl. at 62.

On April 5, 2012, Defendant Braggs notified Powell that the

ICT would review the CM recommendation. See id. at 35. In her

_____

[10] See Def. Ex., Doc. 171-1 at 4, Inmate Disciplinary Actions for Gaynett Powell (showing a September 4, 2011 infraction for fighting).

affidavit, Braggs stated that she was neither an ICT member nor "involved in the process, hearing or approvals for close management determination or transfer of Inmate Powell." Braggs Aff. at 58. The ICT (Defendants Young and Harris and Officer Tosi) convened on April 12th. See Complaint at 11; Def. Ex., Doc. 171-1 at 35. Defendant Young submitted a declaration, see Def. Ex., Doc. 171-1 at 66-67, Declaration of Tommie Young, Jr. (Young Decl.), stating in pertinent part:

> I was the Chairperson of the Institution Classification Team (ICT) that recommended inmate Gaynett Powell, DC #L07899, be designated for close management (Close Management I). At the time the ICT convened, inmate Powell was found guilty of aggravated assault of another inmate. This qualifies him for close management and upon review of the documents and conduct of hearing with inmate Powell present, the ICT recommended close management. This recommendation would be sent to the state classification officer for final decision.

Id. at 67. Defendant Harris also submitted a declaration, see id. at 63-65, Declaration of Jeremy Harris (Harris Decl.), stating in pertinent part:

> I was the Colonel at Lake Correctional Institution in 2012 and assigned to the Institutional Classification Team ("ICT"). When an inmate is referred for close management, ICT will review the case and make a recommendation to the State Classification Officer. I was one of the members at the ICT hearing for inmate Gaynett Powell, DC #L07899. I was not involved with inmate Powell's disciplinary hearing process. Inmate Powell was recommended for close management by a classification officer. Once such

recommendation is made, the inmate is given a copy of the recommendation[,] and the ICT will then set a review hearing with the inmate.

When inmate Powell's ICT met, he had been found guilty of aggravated battery or attempted aggravated battery on an inmate. I understand the victim inmate recanted his testimony that inmate Powell was involved in his stabbing but the disciplinary review hearing [team] found him guilty[,] and he was presently in disciplinary confinement. It is not unusual for a victim inmate to recant his testimony. This is especially true when the assault involves a dangerous and violent inmate like Powell. The ICT will review all of Powell's documents and based on the entirety of his record, Powell demonstrated an inability to reside in general population without presenting a risk of violence to other inmates. The ICT recommended close management (Close Management I) for inmate Powell and this was sent to [the] State Classification Office for review and final determination. The mere fact that a disciplinary report is, or is not, written on [an] inmate is not a criterion for close management. But at the time of his ICT recommendation, he had been found guilty of aggravated assault.

Id. at 64. On April 18, 2012, Defendant Casimir approved Powell's CMI designation. See Complaint at 11; Def. Ex., Doc. 171-1 at 36. Casimir submitted an affidavit, see Def. Ex., Doc. 171-1 at 68-70, Affidavit of Carol Casimir (Casimir Aff.), attesting in pertinent part:

As a Correctional Services Administrator for Southern Florida Region of Institutions in 2012, I am authorized to perform functions as the State Classification Officer (SCO) for Lake Correctional Institution (Lake C.I.). The State Classification Officer oversees several correctional institutions and issues final orders involving inmate classification and

transfer. The decisions I made involving
Inmate Gaynett Powell were all based on
recommendations from the correctional
institution. I am not involved at the
correctional institution level[.] I do not
participate in the disciplinary or institution
classification team hearing process. When I
make decisions as the SCO, it is based on
recommendations from the correctional
institution. I do not start the process but
oversee it and would issue approvals or
denials. Thus, I rely on the work,
investigations and hearings held at the
correctional institution. If the inmate meets
the criteria as recommended and expressed by
the ICT[,] then he will normally be approved
at that level. The same is true for transfers.
The ICT makes the recommendation to transfer
an inmate and I would approve or dis[ap]prove
the transfer.

Inmate Gaynett Powell was referred for close
management (CMI) designation by the Lake C.I.
Institutional Classification Team (ICT). Based
on the recommendation of the ICT and the basis
they provided, I approved CMI status for
Gaynett Powell. The ICT recommendation noted
Inmate Powell demonstrates an inability to
reside in general population, was connected
with the aggravated assault of another inmate
and remained in disciplinary confinement....

Id. at 69.

On June 7, 2012, Secretary Representative M. Solano approved

Powell's grievance appeal and overturned the DR, see Complaint at

11, stating in pertinent part:

Your request for administrative review has
been received and evaluated. The disciplinary
report you received on (03/21/12); for
violation (1-10); (Aggravated
Battery/Attempted/Inmate), has been
overturned. Our decision to overturn the
disciplinary report was based on technical
errors made in the processing of same. The

23

> institution has been advised of this decision
> and any necessary adjustments will be made to
> your inmate file.

Def. Ex., Doc. 171-1 at 41. That same day, in response to another

grievance, Solano explained the effect on Powell's CM designation.

> Your placement in close management has been
> through your own behavior. Your record reveals
> that you have demonstrated the inability to
> live in the general population without abusing
> the rights and privileges of other inmates or
> disturbing the security, order or operation of
> the institution.
>
> Although the Disciplinary Report was
> overturn[ed] the institution may or may not
> review your Close Management recommendation.

Id. at 42.

"The First Amendment forbids prison officials from retaliating

against prisoners for exercising the right of free speech." Farrow

v. West, 320 F.3d 1235, 1248 (11th Cir. 2003). "It is an

established principle of constitutional law that an inmate is

considered to be exercising his First Amendment right of freedom of

speech when he complains to the prison's administrators about the

conditions of his confinement." Smith v. Mosley, 532 F.3d 1270,

1276 (11th Cir. 2008) (citing Farrow, 320 F.3d at 1248). An inmate

may maintain a cause of action for retaliation under 42 U.S.C. §

1983 by showing that a prison official's actions were "the result

of [the prisoner] having filed a grievance concerning the

conditions of his imprisonment." Farrow, 320 F.3d at 1248

(quotation marks omitted).

As relevant to this action, the Eleventh Circuit set forth the standard applicable to a First Amendment retaliation case.

> To prove First Amendment retaliation, an inmate must show that: (1) his speech or act was constitutionally protected, (2) he suffered an adverse action from prison officials that would deter a person of ordinary firmness from engaging in the speech or act, and (3) the protected speech or act and adverse action were causally connected. Smith v. Mosley, 532 F.3d 1270, 1276 (11th Cir. 2008); see Moton v. Cowart, 631 F.3d 1337, 1342 (11th Cir. 2011) ("An inmate must establish ... 'his speech or act was constitutionally protected....'"). We've routinely held that a prisoner's complaints about prison conditions, via administrative grievances, lawsuits, and the like are protected under the First Amendment. Smith, 532 F.3d at 1276 (addressing grievances about the conditions of imprisonment); Al-Amin v. Smith, 511 F.3d 1317, 1333-34 (11th Cir. 2008) (addressing a prison's opening of mail from attorneys outside the inmate's presence).

Hollins v. Samuals, 540 F. App'x 937, 938-39 (11th Cir. 2013) (per curiam); Ziegler v. Martin Cty. Sch. Dist., 831 F.3d 1309, 1328 (11th Cir. 2016).

Notably, there must be a causal relationship between the retaliatory action and the protected speech. For a sufficient causal connection, "the prisoner must show that, as a subjective matter, a motivation for the defendant's adverse action was the prisoner's grievance or lawsuit." Jemison v. Wise, 386 F. App'x 961, 965 (11th Cir. 2010) (citing Smith v. Mosley, 532 F.3d 1270, 1278 (11th Cir. 2008)). "Once the plaintiff establishes that the protected conduct was a motivating factor behind the harm, the

burden of production shifts to the defendant. . . . The defendant

can prevail on summary judgment if it can show it would have taken

the same action in the absence of the protected activity." <u>Smith v.</u>

<u>Fla. Dep't of Corr.</u>, 713 F.3d 1059, 1063 (11th Cir. 2013) (citing

<u>Mosley</u>, 532 F.3d at 1278).

The Eleventh Circuit has addressed an inmate's claim for

retaliation against prison officials in the disciplinary context.

> If a prisoner is found guilty of an actual
> disciplinary infraction after being afforded
> due process and there was evidence to support
> the disciplinary panel's fact finding,[11] the
> prisoner cannot later state a retaliation
> claim against the prison employee who reported
> the infraction in a disciplinary report.
> Whether an inmate actually committed the
> charged infraction or whether the disciplinary
> report falsely accuses the inmate are
> questions of fact that are decided by the
> disciplinary panel. In the particular
> circumstances here, [the plaintiff] has
> suffered adverse action (here 30 days'
> disciplinary confinement) because he actually
> violated the prison rules and not because of
> his earlier grievances. To find otherwise
> would render the prison disciplinary system
> impotent by inviting prisoners to petition the
> courts for a full retrial each time they are
> found guilty of an actual disciplinary
> infraction after having filed a grievance.
> Because he was guilty of the disciplinary
> charges resulting in the disciplinary harm at
> issue, [plaintiff]'s retaliation claim fails.

<u>O'Bryant v. Finch</u>, 637 F.3d 1207, 1215-16 (11th Cir. 2011) (per

curiam) (footnote omitted). Thus, an inmate cannot state a claim of

---

[11] <u>See</u> <u>Wolff v. McDonnell</u>, 418 U.S. 539 (1974); <u>Superintendent</u>
<u>v. Hill</u>, 472 U.S. 445 (1985).

retaliation for a disciplinary charge involving a prison rule infraction when the inmate was found guilty of the actual behavior underlying that charge after being afforded adequate due process. See id. at 1215. In other words, there is no causal connection between a DR and a prisoner's freedom of speech if the disciplinary action would have been taken regardless of the prisoner's protected speech. Id. at 1217 (citing Smith, 532 F.3d at 1278, n.22). "Any possible causal connection between the protected activity (the grievances) and the harm (the disciplinary charges and sanctions) is severed since the harm is not in reaction to any protected activity, but directly due to an improper activity." Id. at 1219-20.

First, Powell asserts that Defendants Reed, Braggs, Williams, and Young retaliated against him for executing a witness statement for inmate Abner Graham when they (1) placed him in AC pending an investigation into the March 21st stabbing of inmate Dieudonne; (2) issued a DR for aggravated battery or attempted aggravated battery based on Dieudonne's initial statement that Powell had stabbed him; and (3) found Powell guilty of the disciplinary infraction when they knew Dieudonne later said that Powell was not involved. The material facts underlying Powell's retaliation claims relating to the AC placement and disciplinary proceedings are undisputed. Powell was placed in AC pending an investigation due to Dieudonne's initial statement accusing Powell of stabbing him in the shoulder.

See Def. Ex., Doc. 171-1 at 22-23. Defendant Reed issued a DR against Powell for aggravated battery or attempted aggravated battery based on Dieudonne's initial statement. See id. at 27. During the investigation, Dieudonne recanted, stating that Powell was not involved and that he initially accused Powell because he was "mad" and thought Powell had "sent" the inmate who stabbed him. Id. at 30. Dieudonne never said that officers coerced him to make the initial statement. See id. Defendants Braggs and Williams found Powell guilty of the DR infraction based on Reed's written factual account, and Defendant Young approved the disciplinary team's decision. See Braggs Aff.; Williams Decl.; Def. Ex., Doc. 171-1 at 29. Notably, Powell does not allege that his due process rights were violated during the disciplinary proceedings. Defendants Braggs and Williams explained that there was evidence to support the disciplinary team's finding of guilt. See Braggs Aff.; Williams Decl. Notably, there is no causal connection between the DR and Powell's freedom of speech when the Defendants would have proceeded with the disciplinary action regardless of Powell's protected speech. See O'Bryant, 637 F.3d at 1217. Any possible causal connection between the protected activity (the witness and grievances) and the harm (the disciplinary charge and sanction) was severed since the harm was not in reaction to any protected activity, but directly due to an FDOC infraction. See id. at 1219-20.

28

Powell also states that Defendants Anderson, Young, Harris, and Casimir retaliated against him when they assigned him to CMI and transferred him from LCI to another institution. Powell was interviewed on April 12, 2012, and later placed in CMI based on a finding that he "displayed an inability to reside in general population without presenting a ri[sk] of violence to other inmates." Def. Ex., Doc. 171-1 at 36. Powell does not assert that his due process rights were violated during the process of approving him for CM designation. As to his transfer from LCI, Defendant Folsom submitted an affidavit, <u>see</u> Def. Ex., Doc. 171-1 at 71-72, Affidavit of Jennifer Folsom (Folsom Aff.) explaining how the FDOC makes transfer decisions.

> As to transfers, this is entirely a function of the classification officer, the institution classification team (ICT) and state classification officer (SCO). A recommendation is made with review conducted by the ICT and forwarded to the SCO.

<u>Id.</u> at 72. When Defendant Casimir was informed that Powell's disciplinary report had been overturned, she determined that Powell no longer met the requirements for CMI status. <u>See</u> Casimir Aff. at 69. Casimir therefore approved LCI's recommendation for a non-negative transfer for Powell, <u>see</u> <u>id.</u> at 69-70, "because there probably remained issues between the victim inmate and his aggressors and the non-negative transfer, as the name implies, does not negatively affect [Powell}," <u>id.</u> at 70; <u>see also</u> Def. Ex., Doc. 171-1 at 37 (approving CM release pending a transfer); Braggs Aff.

at 58; Harris Decl. at 64 (stating he did not have anything to do with Powell's transfer); Folsom Aff. at 72 (stating she "was not involved with any transfer of inmate Powell"). The FDOC transferred Powell to Everglades Correctional Institution on July 30, 2012. See Def. Ex., Doc. 171-1 at 1. Thus, to rebut Powell's assertion that his protected conduct was a motivating factor in their decision to transfer him, Defendants provided evidence that Powell was transferred for a non-retaliatory reason. See id. at 70. Given that the FDOC still would have transferred Powell even in the absence of his filing of grievances and complaints relating to his conditions, summary judgment in Defendants' favor is appropriate.

Next, Powell asserts that Defendant Harris retaliated against him when he was promoted to an assistant warden position, and encouraged other staff members not to provide Powell with medical care. See Complaint at 14. In a declaration, Harris addresses the issue, in pertinent part:

> I was transferred to South Florida Reception Center where I understand inmate Powell claims I encouraged medical staff to not treat him. This is not true. First, I have no authority or control over the medical staff nor the medical decisions they make. Second, a reception center can have hundreds of inmates moving through the center on a daily basis. I would have no knowledge that inmate Powell was transferring through the center.

Harris Decl. at 64-65. In the Complaint, Powell neither provides dates nor specific instances where Harris encouraged medical staff to deny him treatment. At deposition, Powell states that he was

transferred to Martin Correctional Institution, and then South Florida Reception Center (SFRC) where he encountered Harris. See P. Depo. at 46. According to Powell, Harris "encouraged Dr. Media" to not treat him in February 2013, and upon Powell's return to SFRC on March 18, 2014, Harris again "encouraged the medical staff[]" to "discontinue" Powell's medical treatment. Response (Doc. 190). Nevertheless, in an affidavit, Powell acknowledges that Dr. Media did treat his elbow. See P. Aff. (Doc. 207) at 7. Given Powell's assertions, he has neither shown that he suffered an adverse action from Harris that would deter a person of ordinary firmness from engaging in protected speech, nor a causal relationship between his protected speech and the retaliatory conduct ("encouraging" others to deny treatment) on the part of Defendant Harris.

Additionally, Powell asserts that Defendant Folsom retaliated against him when she confiscated his property upon his return to LCI in 2013. See Complaint at 12. Notably, Powell arrived at LCI on January 25, 2013, and departed LCI on February 25, 2013. See Def. Ex., Doc. 171-1 at 2, 8. At deposition, Powell stated that Folsom and other officers met him with a wheelchair as he exited the transportation van. See P. Depo. at 38. According to Powell, Folsom took his property, stated "[y]ou don't get that where you're going at[,]" id. at 44, and then "wheelchair[ed] him to LCI's mental health unit," id. at 38. He stated that his trial transcript and a

picture of his mother are still missing. See id. at 45. In an affidavit, Folsom states, in pertinent part:

> I was Warden at Lake Correctional Institution from 2011 to February 2013. The claims made by inmate Gaynett Powell, DC #07899 that I, as Warden of [Lake] Correctional Institution, seized his property and had him transferred are not true. First, as Warden, I do not interact with the inmates and seize anything. There are always procedures and processes at the correctional institution to conduct its business. Property is never seized by a Warden and unlike inmate Powell's claims, we do not order transfers. Inmate's property is controlled and inventoried through the dormitory and property room officers. An inventory is done when an inmate's property is seized. I am not aware of any complaints or grievances filed by inmate Powell about his property.

Folsom Aff. at 72. Powell acknowledges that the circumstances surrounding his transfer to LCI that day were of a medically-critical nature due to his declining health, and therefore, officers immediately escorted him to the medical clinic. See Complaint at 12. Notably, the FDOC rules provide that property room officers inventory inmate property upon arrival at a penal institution. See FLA. ADMIN. CODE r. 33-602.201, "Inmate Property." Thus, even assuming officers took Powell's property just before his escort to LCI's mental health unit, Powell has failed to show a causal relationship between his protected speech and any retaliatory action on the part of Defendant Folsom.

Given the evidence submitted by Defendants, the Court finds they have met their initial burden of showing, by reference to

declarations, affidavits, and FDOC transfer, DR, and CM records, that appropriate procedures were used when they placed him in AC pending an investigation into the stabbing of Dieudonne, issued a DR for aggravated battery or attempted aggravated battery, found him guilty of the disciplinary infraction, placed him in CM, and transferred him from LCI. Thus, Powell is required to present evidence to show that there is a genuine issue for trial; he has not done so. If this case were to proceed to trial, Powell would have only his testimony to support his claims. All the exhibits submitted by Defendants support their position that their actions were not retaliatory and were unrelated to Powell's decision to execute a witness statement for inmate Graham and/or his filing of grievances and complaints about his conditions. Powell has failed to point to any evidence creating a question of fact as to their evidence.

In light of the evidence presented by Defendants and Powell's failure to provide any evidence other than his own uncorroborated version, no reasonable jury could find for Powell. See generally Goodman v. Kimbrough, 718 F.3d 1325, 1332 (11th Cir. 2013) (recognizing that "to defeat a motion for summary judgment, [the plaintiff] must adduce specific evidence from which a jury could reasonably find in his favor; [t]he mere existence of a scintilla of evidence in support of [his] position will be insufficient" (quotations and citation omitted)). As such, Defendants' Motion is

due to be granted as to Powell's First Amendment retaliation claims against Defendants Harris, Reed, Casimir, Anderson, Folsom, Young, Williams, and Braggs.[12]

### B. Defendant Mesa's Motion for Summary Judgment

#### 1. Eighth Amendment Deliberate Indifference

Powell asserts that Defendant Mesa denied him proper medical treatment for his arm and hunger-strike symptoms. <u>See</u> Complaint at 12-14, 22. Defendant Mesa maintains that "[t]he evidence does not show that Defendant's response to [Powell]'s medical symptoms was objectively harmful to be a constitutional violation." Mesa Motion at 9. In support of her Motion, Defendant Mesa submitted an affidavit, <u>see</u> Def. Ex., Doc. 196-1 at 1-4, Affidavit of Dr. Virginia Mesa (Mesa Aff.), Powell's medical records, <u>see</u> <u>id.</u> at 5-23, and Powell's deposition, <u>see</u> P. Depo. Powell responded, <u>see</u> Response (Doc. 209), and submitted his own affidavit, <u>see</u> P. Aff. (Doc. 207). In his Affidavit, Powell states that genuine issues of material fact exist, and the Court therefore should deny Mesa's Motion, permit additional discovery, and appoint a medical expert "who will be better able to appraise [sic] the Honorable Court on whether [he] was denied treatments." P. Aff. at 8.

The Eleventh Circuit has explained the requirements for a claim of constitutionally inadequate care:

---

[12] For this same reason, Defendants assertion of their right to qualified immunity would provide an alternative basis for dismissal.

> "The Constitution does not mandate
> comfortable prisons, but neither does it
> permit inhumane ones . . . ." <u>Farmer</u>, 511 U.S.
> at 832, 114 S.Ct. at 1976 (internal quotation
> and citation omitted).[13] Thus, in its
> prohibition of "cruel and unusual
> punishments," the Eighth Amendment requires
> that prison officials provide humane
> conditions of confinement. <u>Id.</u> However, as
> noted above, only those conditions which
> objectively amount to an "extreme deprivation"
> violating contemporary standards of decency
> are subject to Eighth Amendment scrutiny.
> <u>Hudson</u>, 503 U.S. at 8-9, 112 S.Ct. at 1000.[14]
> Furthermore, it is only a prison official's
> subjective deliberate indifference to the
> substantial risk of serious harm caused by
> such conditions that gives rise to an Eighth
> Amendment violation. <u>Farmer</u>, 511 U.S. at 828,
> 114 S.Ct. at 1974 (quotation and citation
> omitted); <u>Wilson</u>, 501 U.S. at 303, 111 S.Ct.
> at 2327.[15]

<u>Thomas v. Bryant</u>, 614 F.3d 1288, 1306-07 (11th Cir. 2010). "To show

that a prison official acted with deliberate indifference to

serious medical needs, a plaintiff must satisfy both an objective

and a subjective inquiry." <u>Brown v. Johnson</u>, 387 F.3d 1344, 1351

(11th Cir. 2004) (quoting <u>Farrow v. West</u>, 320 F.3d 1235, 1243 (11th

Cir. 2003)). First, the plaintiff must satisfy the objective

component by showing that he had a serious medical need. <u>Goebert v.

Lee Cty.</u>, 510 F.3d 1312, 1326 (11th Cir. 2007).

> "A serious medical need is considered
> 'one that has been diagnosed by a physician as
> mandating treatment or one that is so obvious

---

[13] <u>Farmer v. Brennan</u>, 511 U.S. 825 (1994).

[14] <u>Hudson v. McMillian</u>, 503 U.S. 1 (1992).

[15] <u>Wilson v. Seiter</u>, 501 U.S. 294 (1991).

> that even a lay person would easily recognize
> the necessity for a doctor's attention.'" Id.
> (citing Hill v. Dekalb Reg'l Youth Det. Ctr.,
> 40 F.3d 1176, 1187 (11th Cir. 1994)). In
> either case, "the medical need must be one
> that, if left unattended, pos[es] a
> substantial risk of serious harm." Id.
> (citation and internal quotations marks
> omitted).

Brown, 387 F.3d at 1351. Next, the plaintiff must satisfy the

subjective component, which requires the plaintiff to "allege that

the prison official, at a minimum, acted with a state of mind that

constituted deliberate indifference." Richardson v. Johnson, 598

F.3d 734, 737 (11th Cir. 2010) (per curiam) (describing the three

components of deliberate indifference as "(1) subjective knowledge

of a risk of serious harm; (2) disregard of that risk; (3) by

conduct that is more than mere negligence") (citing Farrow, 320

F.3d at 1245); Lane v. Philbin, 835 F.3d 1302, 1308 (11th Cir.

2016) (setting forth the three components) (citing Farrow, 320 F.3d

at 1245).

> In Estelle[16], the Supreme Court
> established that "deliberate indifference"
> entails more than mere negligence. Estelle,
> 429 U.S. at 106, 97 S.Ct. 285; Farmer, 511
> U.S. at 835, 114 S.Ct. 1970. The Supreme Court
> clarified the "deliberate indifference"
> standard in Farmer by holding that a prison
> official cannot be found deliberately
> indifferent under the Eighth Amendment "unless
> the official knows of and disregards an
> excessive risk to inmate health or safety; the
> official must both be aware of facts from
> which the inference could be drawn that a

---

[16] Estelle v. Gamble, 429 U.S. 97 (1976).

> substantial risk of serious harm exists, and
> he must also draw the inference." Farmer, 511
> U.S. at 837, 114 S.Ct. 1970 (emphasis added).
> In interpreting Farmer and Estelle, this Court
> explained in McElligott[17] that "deliberate
> indifference has three components: (1)
> subjective knowledge of a risk of serious
> harm; (2) disregard of that risk; (3) by
> conduct that is more than mere negligence."
> McElligott, 182 F.3d at 1255; Taylor,[18] 221
> F.3d at 1258 (stating that defendant must have
> subjective awareness of an "objectively
> serious need" and that his response must
> constitute "an objectively insufficient
> response to that need").

Farrow, 320 F.3d at 1245-46.

The chronology of events on which Powell bases his deliberate indifference medical claim against Defendant Mesa is as follows. Powell was confined at LCI from September 8, 2011, to July 30, 2012, and again from January 25, 2013, to February 25, 2013. See Def. Ex., Doc. 171-1 at 1-2. Powell went on a hunger strike as a "protest" for almost three weeks at Charlotte Correctional Institution (Charlotte CI). P. Depo. at 39. The Charlotte CI mental health staff transferred Powell on January 25, 2013, to LCI's mental health hospital because he had lost consciousness and was "very weak." Id.; Complaint at 12. A mental health administrator explained Powell's history, symptoms, and behaviors that the staff believed necessitated inpatient mental health care at the Crisis Stabilization Unit (CSU) at LCI.

---

[17] McElligott v. Foley, 182 F.3d 1248 (11th Cir. 1999).

[18] Taylor v. Adams, 221 F.3d 1254 (11th Cir. 2000).

> Inmate has been refusing mental health
> treatment, including participation in
> interviews, medications, and evaluations by
> nursing. Reported A/H [(auditory
> hallucinations)] and verbalizes paranoid
> ideation about being harmed/killed by security
> and MH [(mental health)] staff. Refuses to eat
> due to fear of people tampering with his food.
> Refused past 43 meals and today's interview.
> Our CHO, Dr. Hemphill, reported we are
> approaching a medical crisis at this point.
>
> . . . .
>
> Based on the chart, [Powell] has received
> inpatient and outpatient TX [(treatment)]
> prior to and during incarceration, including
> CSU and TCU [(transitional care unit)]
> admissions for depression, hallucinations, and
> self-injury or threats of self-harm. He has a
> significant HX [(history)] of head injury in
> 1990 and substance abuse since age 12, for
> which he has received TX.

Def. Ex., Doc. 196-1 at 22, Charlotte CI Mental Health Clinic Request for Inmate Transfer for Inpatient Treatment at CSU.

Defendant Mesa, LCI's CHO, held the position in 2013 when Powell arrived. See Mesa Aff. Upon arrival at LCI, Powell was experiencing symptoms from the three-week self-imposed hunger strike. See P. Depo. at 42. He described ailments, such as high blood pressure, insomnia, dizziness, exhaustion, weight loss, bloody urine, and "brain jumping." Id. at 43; Complaint at 13. In an affidavit, Defendant Mesa declared, in pertinent part:

> Inmate Powell was transferred to Lake
> C.I. on January 25, 2013 from Charlotte C.I.
> At the time of transfer, inmate Powell's
> records indicated that he was not eating, had

missed 45 meals, and was down in weight by 25 lbs.[19]

I examined inmate Powell on January 29, 2013.[20] During the review of sy[mptom]s examination, Inmate Powell gave a past history of Gonorrhea, depression or excessive worry, allergies, and frequent or painful urination.[21] Inmate Powell requested a special 4,000 calorie high-protein diet and vitamins as a favor to him.[22] He stated that if I gave him the special diet, he would only stay in the mental health unit for two weeks. I told him that I do not provide special favors and that his current health status does not require vitamins and a high-calorie diet. I noted that inmate Powell's body mass index (BMI) was 24.37.[23] For a high-calorie diet to become medically necessary, an inmate would need a BMI of 18 or lower. Inmate Powell did not require a high-calorie diet. Inmate Powell refused to allow medical staff to check his vital signs (including weight) on February 1, 5, 6, 19, and 23.[24]

On February 7, 2013, I examined inmate Powell who appeared to have low hemoglobin. I

---

[19] See Def. Ex., Doc. 196-1 at 5, FDOC Health Information Transfer/Arrival Summary (stating Powell was not eating, had missed 45 meals, and lost 25 pounds, and that his medication (Vistaril) was "on hold due to not eating").

[20] See Def. Ex., Doc. 196-1 at 7, Powell's medical record.

[21] See Def. Ex., Doc. 196-1 at 7.

[22] See Def. Ex., Doc. 196-1 at 7; 8, Chronological Record of Health.

[23] See Def. Ex., Doc. 196-1 at 10, Powell's medical record.

[24] See Def. Ex., Doc. 196-1 at 14-19, Refusal of Health Care Services.

prescribed iron supplements to treat the low
hemoglobin.[25]

I met with inmate Powell on February 18,
2013 to discuss the results of an x-ray of his
left elbow. The x-ray showed no fracture,
dislocation, or subluxation, as well as,
normal soft tissue planes and bone density.[26]
At the meeting, inmate Powell refused to
discuss the x-ray results, refused to let me
examine his elbow, and refused to let himself
be weighed.[27]

Mesa Aff. at 2-3 (footnotes omitted).

Powell states that he injured his elbow on February 13, 2013.

See Powell Aff. (Doc. 207) at 7. He maintains that it takes at

least two weeks to "process and return" x-ray results. Id. The

Radiology Report shows that the x-ray of his left elbow was taken

on February 13, 2013, and Dr. Saks, M.D., reviewed the x-ray the

following afternoon on February 14th. See Def. Ex., Doc. 196-1 at

13. The findings were as follows:

AP [(anteroposterior)] and lateral views of
the left elbow demonstrate no fracture,
dislocation, or subluxation. Alignment of
bones is excellent. The soft tissue planes are
normal without displacement of fat planes.
There are no radiopaque foreign bodies. Bone
density and maturity are normal for a patient
of this age.

Minimal degenerative changes.

---

[25] See Def. Ex., Doc. 196-1 at 11, Chronological Record of
Inpatient Mental Health Care.

[26] See Def. Ex., Doc. 196-1 at 13, Radiology Report for Injury
to Left Elbow.

[27] See Def. Ex., Doc. 196-1 at 9, 18.

See Def. Ex., Doc. 196-1 at 13, Radiology Report for Injury to Left Elbow. Dr. Mesa received the Radiology Report on February 18, 2013. See id. FDOC officers escorted Powell for left-elbow "wound care" on February 20, 2013. See Def. Ex., Doc. 196-1 at 9. The medical entry states, in pertinent part:

> Inmate escorted to TX room for wound care per order. [No] open area noted. But l[ef]t elbow is slightly swollen just above the bone. And inmate states that "it hurts when they handcuff me in the back." Wound care - [no] drainage. [No] [signs] of infection [at] this time. . . . Refused to have weight done stating "I'm all good."

Id.

As to any complaints about Defendant Mesa's negligent acts and unprofessional conduct in providing allegedly substandard medical care, see Response (Doc. 209) at 10, the law is well settled that the Constitution is not implicated by the negligent acts of corrections officials and medical personnel. Daniels v. Williams, 474 U.S. 327, 330-31 (1986); Davidson v. Cannon, 474 U.S. 344, 348 (1986) ("As we held in Daniels, the protections of the Due Process Clause, whether procedural or substantive, are just not triggered by lack of due care by prison officials."). A complaint that a physician has been negligent "in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." Bingham v. Thomas, 654 F.3d 1171, 1176 (11th Cir. 2011) (per curiam) (quotation marks and citation omitted). While Plaintiff's allegations may suggest medical

41

malpractice, "[a]ccidents, mistakes, negligence, and medical malpractice are not 'constitutional violation[s] merely because the victim is a prisoner.'" <u>Harris v. Coweta Cty.</u>, 21 F.3d 388, 393 (11th Cir. 1994) (citing <u>Estelle</u>, 429 U.S. at 106). Consequently, the allegedly negligent conduct of Dr. Mesa about which Powell complains does not rise to the level of a federal constitutional violation and provides no basis for relief in this 42 U.S.C. § 1983 action.

Powell believes that there was "some type of medical treatment" that Defendant Mesa could provide to address and/or cure his ailments. P. Depo. at 43. He acknowledges that Defendant Mesa prescribed over-the-counter medications (Ibuprofen) and high blood pressure medication, and ordered an x-ray and daily wound changes. <u>See</u> P. Aff. (Doc. 207) at 3-4; Response (Doc. 209) at 3. However, he maintains that he needed a more targeted-treatment regimen for his specific hunger-strike symptoms and injured elbow, including stronger pain medication, muscle relaxers, and a high-calorie diet. <u>See</u> P. Aff. (Doc. 207) at 7; Response (Doc. 209) at 3. He concludes that Mesa's "treatments were ineffective." P. Aff. at 4. Dr. Mesa disagreed with Powell; she opined that Powell's body mass index did not warrant a high-calorie diet. <u>See</u> Mesa Aff.

The United States Supreme Court has stated:

> [T]he question whether an X-ray or additional
> diagnostic techniques or forms of treatment is
> indicated is a classic example of a matter for
> medical judgment. A medical decision not to

> order an X-ray, or like measures, does not
> represent cruel and unusual punishment. At
> most[,] it is medical malpractice, and as such
> the proper forum is the state court . . . .

Estelle, 429 U.S. at 107; Adams v. Poag, 61 F.3d 1537, 1545 (11th Cir. 1995) ("[T]he question of whether [Defendant Mesa] should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment."). "Nor does a simple difference in medical opinion as to [Powell's] diagnosis or course of treatment support a claim of cruel and unusual punishment." Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991) (citation omitted). Moreover, medical treatment violates the Constitution only when it is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Rogers, 792 F.2d at 1058 (citation omitted)). Defendant Mesa asserts, and this Court agrees, that there remain no genuine issues of material fact as to Powell's deliberate indifference claim against her. Mesa did not disregard Powell's medical needs; instead, she and her staff were responsive to and timely addressed his needs. She simply was not deliberately indifferent to his serious medical needs. As such, Defendant Mesa's Motion is due to be granted as to Powell's Eighth Amendment deliberate indifference claim against her.

## 2. First Amendment Retaliation Claim

Powell asserts that Defendant Mesa retaliated against him for filing grievances when she denied him proper medical treatment and transferred him to a non-medical institution. See Complaint at 13, 20. Defendant Mesa maintains that "[t]he evidence fails to establish a causal connection between the retaliatory act and the adverse effect on the conduct." Mesa Motion at 10. In his Response, Powell states that genuine issues of material fact exist as to his retaliation claims against Defendant Mesa, and therefore, the Court should deny Mesa's Motion. See Response at 7; P. Aff. at 8.

In Mesa's affidavit, she addressed Powell's retaliation assertions against her.

> Inmate Powell claims that as he was entering the mental health unit Warden Folsom stated to me that "he is back." This is false. Warden Folsom did not say that to me, nor would Warden Folsom personally escort inmates to the mental health unit. Moreover, inmate Powell falsely claims that I told him that things would get better for him if he stops writing grievances and complaints. I did not tell him that, nor would I say any such statement to an inmate.
>
> . . . .[28]
>
> I did not and do not have the authority to transfer inmate Powell to another facility, to

---

[28] Defendant Mesa states: "I could not have discontinued inmate Powell's antidepressant medication as only the prison's psychiatrist has that authority." Mesa Aff. at 3. Notably, Powell blames Dr. Walker for discontinuing his antidepressant medication, not Dr. Mesa. See Complaint at 11 ¶18, 19 ¶45; P. Depo. at 46-47.

> place an inmate in close management, or into
> AC confinement as he claims.

Mesa Aff. at 3.

Given the undisputed material facts relating to Mesa's treatment plan, she appropriately addressed Powell's injuries during his one-month stay at LCI. At most, there was a difference of opinion as to the safest approach to treat Powell's self-imposed food-deprivation ailments. Additionally, Mesa had no authority to transfer Powell to another institution. See id. Nevertheless, as Powell explained, his transfer to a non-medical institution resulted in a referral to a specialist at SFRC where he obtained additional treatment for his elbow. See P. Aff. (Doc. 207) at 7. In light of Powell's assertions, he has not shown that he suffered adverse actions from Dr. Mesa (that would deter a person of ordinary firmness from filing grievances). And, even assuming such, he has not shown that his protected speech (the filing of grievances) and any adverse actions were causally connected. As such, Defendant Mesa's Motion is due to be granted.

### 3. Fourteenth Amendment Claim

Defendant Mesa maintains that Powell's Fourteenth Amendment claim against her "is unclear." Mesa Motion at 11. In his Response, Powell fails to address any Fourteenth Amendment claim against Defendant Mesa. See Response (Doc. 209). To establish a claim cognizable under the Equal Protection Clause, an inmate must show that "(1) he is similarly situated to other prisoners who received

more favorable treatment[,] and (2) the state engaged in invidious discrimination against him based on race, religion, national origin, or some other constitutionally protected basis." <u>Sweet v. Sec'y, Dep't. of Corr.</u>, 467 F.3d 1311, 1318–19 (11th Cir. 2006) (citing <u>Jones v. Ray</u>, 279 F.3d 944, 946–47 (11th Cir. 2001); <u>Damiano v. Fla. Parole and Prob. Comm'n</u>, 785 F.2d 929, 932–33 (11th Cir. 1986)). Taking Powell's assertions as true, he neither alleges the existence of any similarly-situated comparator, nor presents any facts that Mesa discriminated against him on some constitutionally protected basis.

Additionally, as to any Fourteenth Amendment due process violation, Defendant Mesa was neither involved in Powell's AC, CM, DC assignments, disciplinary proceedings, nor institutional transfers. <u>See</u> Mesa Aff. at 3. To the extent Powell blames Defendant Mesa for his transfer to Martin Correctional Institution, which he describes as a non-medical institution, <u>see</u> P. Depo. at 46, "an inmate has no justifiable expectation that he will be incarcerated in any particular prison within a State[.]" <u>Olim v. Wakinekona</u>, 461 U.S. 238, 245 (1983) (footnote omitted); <u>see also</u> <u>Barfield v. Brierton</u>, 883 F.2d 923, 936 (11th Cir. 1989) (citing <u>Meachum v. Fano</u>, 427 U.S. 215 (1976)) (stating "inmates usually possess no constitutional right to be housed at one prison over another"). In light of the foregoing, Defendant Mesa's Motion is

due to be granted as to any Fourteenth Amendment claim against her.[29]

## C. Defendant Jhon Deo (John Doe)

The Court instructed Powell that it is his responsibility to identify the John Doe Defendant. <u>See</u> Order (Doc. 17), filed October 20, 2016, at 1 n.1. The Court advised Powell that dismissal of the Defendant may be warranted if the Defendant "cannot be identified sufficiently in order to summon that individual to appear . . . ." <u>Id.</u> Over the course of these proceedings, Powell has failed to provide any information for service of process on the John Doe Defendant. Powell has had sufficient time to identify the Defendant, and more than two years has passed since the Court advised Powell. Moreover, Powell engaged in discovery to identify other Defendants. <u>See</u> Orders (Docs. 106, 99, 77); Notice (Doc. 68). Therefore, Powell's claims against Defendant Jhon Deo (John Doe) are due to be dismissed.

## D. Defendant Dr. Walker

Powell filed an Objection to the Department of Corrections' Response to the Court Order Dated October 1, 2018 (Objection; Doc. 210). In the Objection, Powell asserts that the FDOC, in its response (Doc. 166), "unjustly failed to act[] with reasonable diligence and with energetic [sic] in attempting to comply with the

---

[29] The Court need not address Defendant Mesa's assertions that Powell is not entitled to injunctive relief and monetary damages. <u>See</u> Mesa Motion at 14-15.

Court's Order [(Doc 161)]." Objection at 2. As relief, he seeks sanctions against the FDOC and a stay of the case until the FDOC locates Dr. Walker. See id. at 3. On May 10, 2019, the Court denied Powell's request to reconsider the Court's dismissal of Defendant Walker, and reinstate Walker as a Defendant. See Order (Doc. 203). In doing so, the Court stated, in pertinent part:

> As to Walker, the Court dismissed him on January 30, 2019. See Order (Doc. 179). The Court has addressed the lengthy process that evolved over the years to attempt to serve Defendant Walker without success. See Order (Doc. 161). Upon review, the Court will deny Powell's request to reinstate Dr. Walker as a Defendant. See Docs. 166, 161, 156, 149, 141, 138, 118, 50.

Id. at 2. As such, Powell's Objection is due to be overruled.

### E. Request to Reopen Discovery

Powell states that the Court entered "a second discovery scheduling order" to permit him to engage in discovery with Dr. Mesa. P. Aff. (Doc. 207) at 1; see also Scheduling Order for Defendant Mesa (Doc 162) ("All discovery with respect to Plaintiff's claims against Doctor Mesa shall be completed on or before January 2, 2019.") (emphasis deleted), filed October 1, 2018. Preliminarily, the Court notes that a request for affirmative relief, such as a request to reopen discovery, is not properly made when simply included in a response to a motion. See Fed. R. Civ. P. 7(b). Moreover, even if it were proper to include such a request in a response to a summary judgment, the request is otherwise due to be denied for failure to comply with Local Rules 3.01(a) and

48

3.01(g), United States District Court, Middle District of Florida (Local Rule(s)). Local Rule 3.01(a) requires a memorandum of legal authority in support of a request from the Court. See Local Rule 3.01(a). Local Rule 3.01(g) requires certification that the moving party has conferred with opposing counsel in a good faith effort to resolve the issue raised by the motion and advising the Court whether opposing counsel agrees to the relief requested. See Local Rule 3.01(g). Thus, the Court will not entertain Powell's request for relief included in his affidavit.[30]

## F. Motion for Appointment of Experts

Powell requests that the Court appoint medical and First Amendment experts to help the Court understand the issues relating to Powell's assertions against Defendant Mesa. See Motion for Appointment of Experts (Motion; Doc. 208) at 1; P. Aff. (Doc. 207) at 2, 6, 8. Defendants oppose the Motion. See Response in Opposition to Plaintiff's Motion for Appointment of Experts (Def. Response; Doc. 211). They maintain that Powell's assertions are not so complex as to warrant court-appointed medical and First Amendment experts. See id. at 4. The Court agrees that the issues before the Court are straightforward, and neither scientifically nor technically complicated. As such, there are no compelling circumstances that warrant the appointment of medical and First

---

[30] The Court previously addressed the discovery issue. See Order (Doc. 203), filed May 10, 2019, at 2-3; Order (Doc. 181) at 2-3.

Amendment experts to aid the Court in evaluating the evidence. <u>See</u>
Fed. R. Evid. 706(a); <u>Gillentine v. Correctional Med. Servs., Inc.</u>,
556 F. App'x 845, 846 (11th Cir. 2014); <u>Steele v. Shah</u>, 87 F.3d
1266, 1271 (11th Cir. 1996). Accordingly, Plaintiff's Motion for
Appointment of Experts (Doc. 208) is due to be denied.

In light of the foregoing, it is now

**ORDERED AND ADJUDGED:**

1. Defendants Harris, Braggs, Casimir, Reed, Folsom,
Williams, Young, and Anderson's Motion for Summary Judgment (Doc.
171) is **GRANTED** as to Powell's First Amendment claims against them,
and judgment will be entered in their favor.

2. Defendant Mesa's Motion for Summary Judgment (Doc. 196)
is **GRANTED** as to Powell's First, Eighth, and Fourteenth Amendment
claims against her, and judgment will be entered in her favor.

3. Powell's claims against Defendant Jhon Deo (John Doe) are
**DISMISSED.**

4. The Court **OVERRULES** Powell's Objection to the Department
of Corrections' Response to the Court Order Dated October 1, 2018
(Doc. 210).

5. Powell's Motion for Appointment of Experts (Doc. 208) is
**DENIED.**

6.     The   Clerk   shall   enter   judgment   in   favor   of   the
Defendants, and close the case.

**DONE AND ORDERED** in Chambers, this 27th day of August, 2019.

MARCIA MORALES HOWARD
United States District Judge

sc 8/27
c:
Gaynett Powell, FDOC #L07899
Counsel of Record